UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

        v.

JUSTIN M. SCOTT and
OMID KAMSHAD,

                              Defendants

C.A. No.   03-CV-12082 (EFH)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JUSTIN M.
SCOTT'S MOTION FOR SUMMARY JUDGMENT**

**JUSTIN M. SCOTT**

R. Robert Popeo (BBO #403360)
John F. Sylvia (BBO #555581)
Jessica Lowney Sergi (BBO #665758)
MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, P.C.
One Financial Center
Boston, MA  02111
(617) 542-6000 (*telephone*)
(617) 542-2241 (*fax*)

# TABLE OF CONENTS

**Page**

Argument ............................................................................................................. 3

1. Mr. Scott's Conduct Was Not "Fraudulent" Within The Meaning Of Section 206,
   And Therefore Is Not Actionable Under That Statute Or Any Other Section Of
   The Securities Laws ....................................................................................... 3

   A. Mr. Scott Did Not Make Any Fraudulent Statements Or Omissions. .........4

   B. Mr. Scott Did Not Commit Any "Fraudulent" Acts ...................................5

   C. Mr. Scott Did Not Commit "Fraud" By Violating Any "Fiduciary"
      Responsibility Under Section 206. .............................................................7

2. Mr. Scott Did Not Receive "Fair Warning" That His Actions Might Expose Him
   To Liability Under Section 206. ..................................................................... 9

   A. Mr. Scott Did Not Receive Fair Warning That The Statutory
      Definition Of "Fraud"  Encompassed Either "Market Timing" Or
      "Excessive Short-Term Trading."...............................................................12

   B. Mr. Scott Did Not Receive Fair Warning Of What Conduct Would
      Constitute Illegal "Market Timing" Or "Excessive Short-Term
      Trading." ...................................................................................................13

   C. The SEC's Definitions Of The Relevant Statutory Terms Are Arbitrary
      Because They Retrospectively Define Proscribed Conduct Strictly In
      Terms Of What Two Particular Defendants Have Already Done,
      Rather Than With Reference To Some Objective Standard. ......................18

3. Mr. Scott Is Entitled To Summary Judgment Because The SEC Has Insufficient
   Evidence To Create A Genuine Issue Of Fact That He Intended To Engage In
   Market Timing. ............................................................................................ 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page

*Advance Pharmaceutical, Inc. v. United States*,
    391 F.3d 377 (2d Cir. 2004)............................................................................11

*American Federation of State, County and Municipal Employees v. American*
    *International Group, Inc.*,
    361 F.Supp.2d 344 (S.D.N.Y. 2005)...............................................................10

*Connally v. General Construction Co.*,
    269 U.S. 385 (1926).........................................................................................11

*Federal Communications Commission v. American Broadcasting Co.*,
    347 U.S. 284 (1954).........................................................................................11

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972).........................................................................................18

*Goldstein v. SEC*,
    451 F.3d 873 (D.C.Cir. 2006)..........................................................................20

*H.J., Inc. v. Northwestern Bell Telephone Co.*,
    492 U.S. 229 (1989).........................................................................................11

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004).............................................................................................11

*McBoyle v. United States*,
    283 U.S. 25 (1931)...........................................................................................10

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963).................................................................................7, 8, 19

*SEC v. Chenery*,
    332 U.S. 194 (1947).........................................................................................10

*SEC v. Druffner*,
    353 F.Supp.2d 141 (D.Mass. 2005) ..................................................................5

*SEC v. PIMCO Advisers Fund Management*,
    341 F.Supp.2d 454 (S.D.N.Y. 2004)...............................................................4, 6

*SEC v. Tambone*,
  417 F.Supp.2d 127 (D.Mass. 2006) ...............................................................................4, 6, 12

*Santa Fe Industries, Inc. v. Green*,
  430 U.S. 462 (1977)...................................................................................................................7

*United States v. Lanier*,
  520 U.S. 259 (1997)...........................................................................................................10, 11

*United States v. Private Sanitation Industry Association of Nassau/Suffolk, Inc.*,
  793 F.Supp. 1114 (E.D.N.Y. 1992) ......................................................................................11

**DOCKETED CASES**

*Saunders v. Putnam Am. Gov't Fund, et al.*,
  Civil No. JFM-04-560 (D.Md., July 7, 2006) (Memo to Counsel at 2) (citation
  omitted) ........................................................................................................................................6

This is an enforcement action brought by the United States Securities and Exchange Commission. The defendants, Justin M. Scott and Omid Kamshad, were employees of Putnam Investment Management, LLC, an entity that manages the "Putnam family" of mutual funds. Although the SEC asserts its claims under the anti-fraud provisions of the Investment Advisers Act, 15 U.S.C. §80b-6 (also known as "Section 206"), the defendants were not acting as "investment advisers" with respect to the conduct at issue. They never gave any advice to Putnam's clients (the mutual funds it managed), or to the shareholders of those mutual funds (the putative victims in this case). Indeed, the claims against Mr. Scott and Mr. Kamshad do not even concern their non-advisory roles in the management of any Putnam mutual funds. The charges, rather, only concern certain exchanges (known as "reallocation requests") that the defendants made in retirement accounts set up for them by Putnam.[1]

The SEC alleges that Mr. Scott violated Section 206 by engaging in "excessive short-term trading" of mutual fund shares in his account. Complaint ¶14. The Complaint also refers to something called "market timing," id. at ¶ 18, and the SEC has since asserted more directly that Mr. Scott violated Section 206 by engaging in "market timing." See Trzcinka Report at 3-13. According to the SEC, these practices were actionable "fraud" within the meaning of the Investment Advisers Act, Complaint ¶s 38-41, and expose Mr. Scott to (1) injunctive relief, (2) disgorgement of "all ill-gotten gains," and (3) punitive "civil" penalties. Complaint, Prayer for Relief, ¶s 1-3.

Mr. Scott is entitled to summary judgment for several reasons:

---

[1]     The Defendants have submitted a Joint Statement of Undisputed Facts Pursuant to Local Rule 56.1 along with their separate motions and memoranda of law. The facts referred to in these introductory paragraphs, along with the facts referred to in the argument sections of this memorandum, are all drawn from -- and supported by the citations made in -- the Statement of Undisputed Facts.

First, neither "excessive short-term trading" nor "market timing" is "fraud" within the meaning of Section 206.  Neither the statute nor the regulations define "fraud" in those terms, no court has ever declared that "excessive short-term trading" or "market timing" constitute fraud, and even the SEC has repeatedly admitted that market timing is *not* illegal.  In fact, a federal court in Maryland recently dismissed private securities fraud claims against Mr. Scott, based on the same conduct at issue here, for exactly that reason.

Second, punishing Mr. Scott for committing "fraud" by engaging in "market timing" or "excessive short-term trading" would violate the constitutional "fair warning" requirement because at the time of the trades in question (and even today) nobody had ever defined "fraud" to constitute either market timing or excessive short term trading, and the SEC had never even come up with a coherent definition of "market timing" or "excessive short-term trading."

Finally, even if one ignores these definitional flaws, the SEC's case fails as a matter of fact because the government has offered no competent, admissible evidence to show that Mr. Scott or Mr. Kamshad actually engaged in activities that could be deemed "market timing."   Indeed, the SEC has never identified as "market timing" transactions, any specific reallocation requests made by Mr. Scott or Mr. Kamshad.

## Argument

**1.   Mr. Scott's Conduct Was Not "Fraudulent" Within The Meaning Of Section 206, And Therefore Is Not Actionable Under That Statute Or Any Other Section Of The Securities Laws.**

The relevant portions of Section 206 prohibit (i) the use of any "device, scheme or artifice to defraud" a client, and (ii) any "transaction, practice, or course of business which operates as a fraud or deceit" on a client.  15 U.S.C. §80b-6.  The federal courts

have determined that "fraud" within the meaning of Section 206 is effectively indistinguishable from "fraud" within the meaning of Section 17(a) of the Securities Act, <u>SEC v. PIMCO Advisers Fund Management</u>, 341 F.Supp.2d 454, 470 (S.D.N.Y. 2004), which in turn has "substantially the same" meaning as "fraud" under Section 10(b) of the Exchange Act.  <u>SEC v. Tambone</u>, 417 F.Supp.2d 127, 131 (D.Mass. 2006).  At its core, therefore, Section 206 prohibits the same range of "fraudulent" conduct as Section 17(a) and Section 10(b): (i) untrue statements of material fact, (ii) omissions of fact that make a prior statement misleading, and (iii) manipulative or deceptive acts (as opposed to statements or omissions) committed as part of a scheme to defraud.  <u>Id.</u> at 132 and cases cited.

### A.      Mr. Scott Did Not Make Any Fraudulent Statements Or Omissions.

The SEC has not alleged, and could not prove, that Mr. Scott made any actionable statements or omissions of fact.  In the "market timing" enforcement actions that the SEC has brought so far, the "fraudulent" conduct consisted of potentially material misstatements or omissions (or both) about the trading activity of a person other than the defendant.  In some cases, the defendant was a mutual fund (or fund manager) that allegedly made representations about its willingness and ability to restrict market timing transactions, but nevertheless secretly allowed certain favored customers to engage in the "prohibited" activity.  <u>E.g.</u>, <u>PIMCO Advisors Fund Management, LLC</u>, 341 F.Supp.2d at 459-60.  In others, the defendants were brokers who supposedly enabled their clients to evade mutual fund restrictions on market timing by making false statements to the funds -- for example, using fictitious names and multiple broker identification numbers to help

them to conceal their identities and intentions when they traded.  E.g., SEC v. Druffner, 353 F.Supp.2d 141, 146 (D.Mass. 2005).

No such activity occurred here.  The SEC has not accused Mr. Scott of using falsehoods or subterfuge to help anybody else conduct market timing transactions.  It has not accused him of making any misstatements in connection with the reallocation requests he made for his own retirement accounts.  Instead, the Complaint suggests that he engaged in "undisclosed" short-term "trading" of mutual funds, Complaint ¶1, but this bare allegation (i) does not describe an actionable omission, and (ii) is not supported by any evidence.  The facts, rather, show that all of Mr. Scott's reallocation requests were regulated by and fully disclosed to his employer and its internal compliance watchdogs, and in addition were transparent to federal regulatory authorities.  See Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Facts"), ¶s 21-32.[2/]

**B.**     **Mr. Scott Did Not Commit Any "Fraudulent" Acts.**

In the absence of any actionable statements or failures to speak, the SEC's theory appears to be that the *act* of making a reallocation request, by Mr. Scott and on his own behalf, constituted a "fraud" on the other investors in the mutual funds involved.  See Complaint, ¶1 ("This is an enforcement action . . . for engaging in egregious and undisclosed short-term trading of mutual funds").  But this theory fails, as a matter of law, because a defendant commits actionably "fraudulent" conduct under Section 206

---

[2/]     The record also shows that the activities at issue were not "trades," but reallocation requests.  The accounts in question were actually in retirement and deferred compensation plans maintained by his employer.  Putnam allowed certain employees, including Mr. Scott, to defer a portion of his compensation into these plans.  Putnam then invested the deferred compensation in a variety of mutual funds.  Putnam however retained ownership of the assets in the plans, and Putnam retained ultimate control over how those assets would be invested.  Thus, Mr. Scott could not "trade" his deferred compensation from one mutual fund to another, but could only *request* that Putnam make a trade (by reallocating some or all of his deferred compensation from one mutual fund to another), and Putnam reserved the right to deny an employee's reallocation requests.  See generally Facts, ¶21-32.

only by using "some device that was clearly illegal," such as embezzlement from a client or bribery to obtain a potential client's business. <u>Tambone</u>, 417 F.Supp.2d at 135-36 and cases cited (dismissing "fraud" claims based on allegations of market timing). Mr. Scott did nothing illegal, even if one assumes against the weight of the evidence that he actually engaged in a practice called "market timing."

Market timing may be a disfavored practice, but it is not illegal at all, much less clearly illegal. The SEC has repeatedly admitted this. Facts ¶65. As courts in this district and elsewhere have emphasized, therefore, market timing itself cannot be considered "a fraudulent device intended to defraud investors." <u>PIMCO</u>, 341 F.Supp.2d at 468; <u>Tambone</u>, 417 F.Supp.2d at 136. And if market timing is not a fraudulent device, then engaging in this perfectly legal activity (without making any material misstatements or omissions) cannot give rise to liability under Section 206.

This simple logic has already been applied once to defeat claims against Mr. Scott and Mr. Kamshad based on allegations of "market timing" and "frequent trading." In a parallel civil proceeding in federal court in Maryland, the district court recently dismissed Section 10(b) "fraud" claims against Mr. Scott and Mr. Kamshad under a Rule 12(b)(6) standard precisely "because '[m]arket timing . . . is not illegal *per se*." <u>Saunders v. Putnam Am. Gov't Fund, et al.</u>, Civil No. JFM-04-560 (D.Md., July 7, 2006) (Memo to Counsel at 2) (citation omitted) (Defs. App. Tab LL). The claims were brought by private plaintiffs, and the SEC was not a party to the action, so the outcome in the Maryland case may not *dictate* the outcome here as a matter of *res judicata* or collateral estoppel. However, the Section 10(b) claims in the Maryland action were based on identical factual allegations of "frequent trading" and "market timing," and it has already

been demonstrated that claims under Section 10(b) and Section 206 are governed by identical legal standards.  Consequently, the Maryland court's decisive response to the claims asserted by the private plaintiffs points the way to the correct resolution of the SEC's factually and legally indistinguishable claims against Mr. Scott.

**C.   Mr. Scott Did Not Commit "Fraud" By Violating Any "Fiduciary" Responsibility Under Section 206.**

The SEC also made reference in its Complaint to the notion that "[p]ortfolio managers, as investment advisers, owe a *fiduciary duty* to fund shareholders of utmost good faith, and full and fair disclosure of all material facts."  Complaint ¶13 (emphasis added).  The only "fiduciary" duty the courts have ever identified under Section 206, however, is a duty to avoid conflicts of interest that might undermine an investment adviser's ability to function *as an adviser.*   SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 189 (1963) (investment adviser "should not directly or indirectly engage in any activity which may jeopardize [his] ability *to render unbiased investment advice*") (emphasis added).  See also id. at 190 ("fundamental principles underlying Advisers Act include "not engaging in any other activity, such as security selling or brokerage, which might directly or indirectly bias their investment judgment"); id. at 191-92 (Advisers Act reflects "congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser -- consciously or unconsciously -- to render advice which was not disinterested").

No such conflict of interest could have arisen here, for at least two reasons.  First, as the Supreme Court later emphasized, "the fraud that the SEC sought to enjoin in Capital Gains was, in fact, a nondisclosure."  Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 472 n. 11 (1977).  The defendants in Capital Gains were investment advisers who

had engaged in a practice called "scalping" -- they had purchased stock in Company X for themselves, then touted the stock to their clients, whose subsequent purchases drove up the stock price and the value of the advisers' personal investments.  375 U.S. at 183. The "fraud" in Capital Gains, in other words, did not occur because the defendants had purchased stock in Company X, or because they had touted the stock to their clients, but because they had done so "secretly."  Mr. Scott's "trades" were anything but secret. They were effectuated by his employer, made known to and tracked by Putnam's in-house compliance watchdogs, and were available to government regulators on demand. Facts, ¶ 21-32.

Second, even if one assumes that Mr. Scott's trades were "undisclosed" and even if one accepts the SEC's suggestion that they constituted "market timing," (and furthermore that one assumes that Mr. Scott was an "investment advisor") the activity did not affect, or threaten to affect, his ability to be unbiased.  In Capital Gains, the defendant's purchase of stock in Company X arguably caused him to give advice ("buy Company X") that an unbiased adviser might not have given.  What advice is Mr. Scott supposed to have given the other shareholders, that he would not have given if he had not engaged in the trades at issue?  There could be none.  It is important to note here that, even if some of the mutual funds in which he made reallocation requests were within his oversight as a managerial employee, Mr. Scott was not a day-to-day portfolio manager. Facts ¶11. His title was Chief Investment Officer of Global Core, and in this role he did not have practical control over any fund portfolios.  Facts ¶11-14.  He wasn't in a position to give advice to the shareholders in those funds -- biased or unbiased.  Thus, even if one puts the most culpable spin possible on his actions, Mr. Scott did not create a

conflict of interest for himself as an investment adviser, and did not do anything "fraudulent" that might expose him to liability under that statute.

### 2. <u>Mr. Scott Did Not Receive "Fair Warning" That His Actions Might Expose Him To Liability Under Section 206</u>.

The Court could decide that Mr. Scott's actions violated Section 206, then, <u>only if</u> it also construed the statute to say something that nobody -- not Congress, not the regulators, and not any previous court -- has ever interpreted it to say: either (i) that "market timing" or "excessive short-term trading" by an investment adviser, in and of itself, is always a fraudulent act, even though those practices are not clearly illegal and in fact are not illegal at all, or (ii) that "market timing" or "excessive short-term trading" by an investment adviser is a "fraudulent" violation of the adviser's "fiduciary" duties to his clients, even when his trades (or reallocation requests) *have* been fully disclosed to his employer and the proper authorities, and even when those trades (or reallocation requests) have *not* affected his ability to give disinterested advice to anybody.

The SEC *could* achieve this expansion of the concept of "fraud," of course, by promulgating a rule or regulation to the desired effect. The SEC has a specific legislative mandate to promulgate rules that "define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative" within the meaning of Section 206. 15 U.S.C. §80b-6(4). But the SEC has never exercised that mandate to define "fraudulent" conduct on a going-forward basis to include either "market timing" or "excessive short-term trading." <u>Cf.</u> Facts ¶45, 46,63-65, 69,70 Fed. Reg. 22300 (April 23, 2004) (promulgating rule that requires mutual fund companies to disclose risks of "market timing" and their policies with respect to the practice, but <u>not</u> prohibiting it). Instead, the SEC asks this court to create a judicial

definition of "fraud" that includes something called "market timing" and something called "excessive short-term trading," and to apply that definition retroactively to conduct that occurred several years ago.

But in such a "carefully regulated field" as the securities business, "[t]he function of the court is to apply the law as articulated by legislatures or their authorized regulatory agencies, not independently to create new legal obligations. . . ." American Federation of State, County and Municipal Employees v. American International Group, Inc., 361 F.Supp.2d 344, 347 (S.D.N.Y. 2005). The SEC, "unlike a court, does have the ability to make new law prospectively through the exercise of its rule-making powers." SEC v. Chenery, 332 U.S. 194, 202 (1947). Where a statute, like Section 206, contains only a general proscription, "[t]he function of filling in the interstices of the statute should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future." Id.

The SEC's *ad hoc*, backward-looking approach to defining "market timing" and "excessive short-term trading" runs afoul of this clear institutional preference for prospective, quasi-legislative rule-making. In addition, under the circumstances of this case, it violates more fundamental, constitutional principles of fairness to defendants. The Due Process Clause guarantees "what Justice Holmes spoke of as 'fair warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.'" United States v. Lanier, 520 U.S. 259, 266 (1997), quoting McBoyle v. United States, 283 U.S. 25, 27 (1931).

The "fair warning" requirement has "three related manifestations." Lanier, 520 U.S. at 266. First, the "vagueness doctrine" bars enforcement of a statute "which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Id., quoting Connally v. General Construction Co., 269 U.S. 385, 391 (1926). Second, the "rule of lenity" ensures fair warning "by resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." Lanier, 520 U.S. at 266. Finally, "although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." Id. "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id.[3/]

---

[3/]      Although this case is on the civil docket, and the cases cited in the text were criminal matters, the fair warning requirement applies here for two reasons. First, the SEC seeks punitive "civil" penalties against Mr. Scott. See Complaint, Prayer For Relief at ¶III; 15 U.S.C. §80b-9(e). "When a civil statute imposes penalties that, 'although civil in description, are penal in character,' the statute is sometimes deemed 'quasi-criminal' and subjected to stricter vagueness review." Advance Pharmaceutical, Inc. v. United States, 391 F.3d 377, 396 (2d Cir. 2004) (citations omitted). Second, the Advisers Act is a criminal statute. It authorizes not only punitive "civil" penalties, but felony-grade criminal penalties as well. 15 U.S.C. §80b-17. The fact that the SEC has asked for civil penalties here does not relax the level of scrutiny. Because "[t]here cannot be one construction for the [Securities and Exchange Commission] and another for the Department of Justice," Federal Communications Commission v. American Broadcasting Co., 347 U.S. 284, 296 (1954), a statute that has criminal applications "must, even in its civil applications, possess the degree of certainty required for criminal laws. . . ." United States v. Private Sanitation Industry Association of Nassau/Suffolk, Inc., 793 F.Supp. 1114, 1156 (E.D.N.Y. 1992), quoting H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 255 (1989) (Scalia, J., concurring). See also Leocal v. Ashcroft, 543 U.S. 1, 12 n. 8 (2004) ("we must interpret the statute consistently, whether we encounter its application in a criminal or a noncriminal context").

A.     **Mr. Scott Did Not Receive Fair Warning That The Statutory Definition Of "Fraud" Encompassed Either "Market Timing" Or "Excessive Short-Term Trading."**

Mr. Scott is entitled to summary judgment because he did not receive "fair warning" that his actions could expose him to liability.  The "relevant time" in this case was the period 1997-2000, when Mr. Scott presumably made the reallocation requests that the SEC alleges violated Section 206.  At that time,  it was anything but "reasonably clear" that his conduct might constitute "fraud" under Section 206.  Nothing in the statute itself, nothing in the regulations that were supposed to fill the "interstices" of the statute, and nothing in the case law indicated that "market timing" or "excessive short-term trading" were fraudulent and therefore actionable.  Facts ¶45, 46,63-65, 69,70. As the SEC would have this Court apply it to Mr. Scott, therefore, the statute is unconstitutionally vague, and the novel construction that the SEC wants the Court to give to the statute -- but apply retroactively to Mr. Scott -- unduly burdens his right to due process of law.

In fact, even *today* Section 206's "fraud" prohibition -- as applied to the  type of conduct at issue -- remains "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."   Lanier, 520 U.S. at 266.   Are "market timing" and "excessive short-term trading" currently fraudulent within the meaning of the statute?  No court has said so; to the contrary, the courts have emphasized again and again that market timing in and of itself is not illegal.  See, e.g.  Facts ¶ 65, Tambone, 417 F.Supp.2d at 135-36; Saunders, Memo to Counsel p. 2.  Even the SEC has not said so; it has repeatedly admitted that market timing is "not illegal *per se*," see, e.g., Facts ¶64-65, and the rule it promulgated in 2004 did not prohibit market timing or

excessive short-term trading, but only required mutual fund companies "to disclose in their prospectuses both the risks to shareholders of frequent purchases and redemptions of investment company shares, and the investment company's policies and procedures with respect to such frequent purchases and redemptions."  69 Fed. Reg. 22300-01 (April 23, 2004).

The line between fraudulent and innocent conduct, therefore, was not clear when Mr. Scott and Mr. Kamshad made the reallocation requests at issue, and -- given the SEC's rule-making power -- it could have been much clearer.  As a matter of law (and constitutional right), the punitive burden of that imprecision can not fall on the Defendants.

> **B.** **Mr. Scott Did Not Receive Fair Warning Of What Conduct Would Constitute Illegal "Market Timing" Or "Excessive Short-Term Trading."**

There is another level of indefiniteness here that also deprived Mr. Scott of due process.  Even if Section 206 or a competent authority *had* previously defined "fraud" to include "market timing" or "excessive short-term trading," a defendant could not be subjected to punishment, consistent with due process, until those practices themselves had been sufficiently defined to give fair warning of what constituted potentially unlawful behavior.  But the definitional murk surrounding both phrases is so deep and so dark that "men of common intelligence" must still guess at their meaning and differ as to their application, and even the SEC itself has yet to arrive at a consistent or coherent definition of either "market timing" or "excessive short-term trading."

**Market Timing.** As Professor Tufano said in his report, "[t]here are no clear definitions of 'market timing' in regulations or legislation."  See Tufano Report at p. 3.

The SEC does not disagree.  Cf. 69 Fed. Reg. 22300 at n. 11 ("Market timing can take many forms").  The Complaint in this case does not try to define the term, and in fact barely mentions "market timing."  See Complaint ¶18.  In previous cases, however, the SEC has alleged that the term "refers to the practice of *short-term* buying *and* selling of mutual fund shares in order to exploit inefficiencies in mutual fund pricing."  See, e.g., Druffner Complaint (emphasis added).  This was similar to the definition that Professor Tufano used in attempting to evaluate the "dilution cost" of potential market timing for purposes of Putnam's settlement with the government: transactions "*with 'relatively short' holding periods*," that are "primarily intended to capitalize on short-term staleness of a fund's net asset value (NAV)."  See Tufano Report at 3-4 (emphasis added).

So far, so good.  But where both the SEC and Professor Tufano once saw short-term "round trips" as the hallmark of "market timing," the SEC and its expert in this case -- Professor Trzcinka -- would now employ a different definition.  Abandoning the position it had staked out in earlier cases (where it said that market timing is a "practice of short-term buying *and* selling of mutual fund shares" in order to exploit pricing inefficiencies), the SEC now insists that the practice consists of "buying *or* selling mutual fund shares in order to exploit inefficiencies" in pricing.  Facts ¶67  The SEC cannot plausibly explain this crucial switch from a conjunctive to a disjunctive definition of market timing.  Nor can it plausibly explain why, when examining Mr. Scott's trades to discern which involved market timing, Professor Trzcinka simply ignored the "sell side" of the transactions, reasoning that this half of the analysis was unnecessary because "market timing" could occur even when the trading party held the shares for long periods of time (or indefinitely).  Facts ¶68.

What, then, is "market timing?"   An investment adviser of "common intelligence," trying to assess the legality of his conduct back in 1997-2000, could not find the answer to that question in the statute; he could not find the answer in the case law; he could not find the answer in the regulations; and even if he had the gift of clairvoyance, he could not have found a reasonably clear definition of the phrase by looking several years into the future, at the SEC's own pronouncements on the subject during the course of this litigation.   Even today, he still would not be able to tell whether he can safely avoid liability by refraining from certain types of short-term buying and selling of mutual funds, or must steer clear of long-term investments as well.   The definition of "fraud by market timing," therefore, was not reasonably clear when Mr. Scott made the reallocation requests at issue (and is not reasonably clear today); and it would violate the fair warning requirement to punish him for engaging in something called "market timing."

**Excessive Short-Term Trading.**   According to the SEC, an investment adviser may commit fraud (and be subject to civil penalties and criminal sanctions) if he or she engages in "excessive short-term trading" of mutual fund shares.   The SEC's expert says that a trade is "short term" if the trader buys and sells the shares within two weeks, Facts ¶49, and that such trading becomes "excessive" if "the preponderance of their trades and the preponderance of their shares were traded in a short-term fashion."   Facts ¶50-53.

This definition of "excessive short-term trading" violates the fair warning requirement for at least two reasons: (1) it is retrospective as applied to Mr. Scott and subjective as applied to anybody, and (2) it doesn't make sense.   Again, nothing in the statute, the regulations, or the case law could have informed Mr. Scott, back in 1998 or

2000, that "round trips" lasting less than two weeks were "short-term," or that a particular investor's short-term trades (or reallocation requests) were "excessive" if they represented a "preponderance" of all his trades (or reallocation requests), even if they were few in number. Indeed, when Professor Tufano looked at this issue in 2005, he found that the concept "ha[d] not been defined" at all.  See Tufano Report at p. 6.  The SEC's expert, Professor Trzcinka, later invented these benchmarks, for purposes of reaching a conclusion in this lawsuit, and admitted on cross-examination that his characterizations were subjective.  See Facts ¶48.

The SEC's working definition of "excessive" short-term trading is not just retrospective and subjective.  It is also so counter-intuitive that nobody -- whether of common intelligence or extraordinary insight -- could have guessed before the fact that "fraud" could or would ever be defined in those terms.  It is important to bear in mind here that, according to the SEC, excessive short-term trading is bad because *every* trade of mutual fund shares imposes costs on the mutual fund and its investors -- "transaction costs, cash management costs . . . , monitoring costs and diversion of management time." See Trzcinka Report at 13.  Too many trades create too many costs.  The SEC's theory, in other words, is that short-term trading (whatever that means) becomes "fraudulent" when it imposes "excessive" costs on the fund.

According to Professor Trzcinka, however, an investor engages in "excessive short-term trading" whenever a "preponderance" or "majority" of his trades are short-term, even if the number of trades is very small.  Facts ¶49-53, 59.  Thus, under the SEC's definition of the term, an investment adviser will commit "fraud" if he trades only three times in a mutual fund, as long as two of those trades are "short-term," even though

the size of the fund may be very large and the number of trades very small, and the costs incurred therefore so minor as to be unmeasurable.  See Facts ¶59-62. On the other hand, the adviser will *not* commit "fraud" even if he trades many, many times in a small mutual fund, imposing significant frictional costs, as long as fewer than half of those trades are short-term.  Obviously, this makes no sense.  By focusing on the proportion rather than the number or actual impact of short-term trades, the SEC's definition of  "excessive" short-term trading is inconsistent with its stated rationale for banning the practice.

It therefore violates the fair warning requirement, too.  How could a person who "traded" mutual fund shares several years ago have known what amount of short-term trading would expose him to liability under Section 206?   Again, he wouldn't have known it by looking at the statute.  He couldn't have figured it out by looking at any rules that the SEC had promulgated to give content to the statute -- because the SEC hadn't done so, even though rule-making is the preferred way for an agency to fill the interstices of a broad prohibitory statute.  And he certainly couldn't have reasoned his way to the definition that the SEC now wants to apply to punish Mr. Scott, using the SEC's own "frictional costs" rationale.  Using the SEC's logic would have led him, paradoxically, to what the SEC now says is the *wrong* conclusion: that the number of short-term trades, rather than the proportion of such trades, is the essential unit of measurement.

**C.**   **The SEC's Definitions Of The Relevant Statutory Terms Are Arbitrary Because They Retrospectively Define Proscribed Conduct Strictly In Terms Of What Two Particular Defendants Have Already Done, Rather Than With Reference To Some Objective Standard.**

The SEC's definitions of "market timing" and "excessive short-term trading" are so illogical and inconsistent that they implicate a second important value underlying the Due Process Clause and the fair warning requirement: "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."   Grayned v. City of Rockford, 408 U.S. 104, 108-9 (1972).

The Defendant submits, with all due respect to the regulators and their sincerity and expertise, that what the SEC proposes here is precisely an "arbitrary and discriminatory application" of Section 206.  The SEC's definitions of "market timing" and "excessive short-term trading" were admittedly subjective.  See Facts ¶48.  The inconsistency and illogic of those definitions, moreover, can best be explained by their tendency to fit the evidence that the government possesses about Mr. Scott's and Mr. Kamshad's actions.

Thus, for example, it does not appear that "excessive" short-term trading is defined in terms of the proportion of short-term trades, rather than the number of such trades, because the proportional definition agrees better with the underlying logic.  It doesn't, for reasons explained above.  The apparent explanation for this patently illogical definition, rather, is that the evidence wouldn't support liability according to a logical definition.  Anybody looking at the number of trades conducted by Mr. Scott (and Mr.

Kamshad) would see that the defendants were actually rather *infrequent* "traders" in their deferred compensation accounts.   Mr. Scott made only 37 "round trip" reallocation[4/] requests during the period 1997-2003. Facts ¶61.  The costs created by those reallocation requests were so minimal that the SEC's expert admitted that he could not measure them. Facts, ¶56-58.

In other words, the SEC's definitions of the essential terms are not just *ad hoc*, but effectively *ad hominem*.  As the SEC would apply it, the statute operates as a kind of bill of attainder, defining the actionable wrong not in objective terms of general application, but in subjective terms of what a particular defendant has already done.  So applied, the statutory prohibition on "fraud" would lose all meaning, and punitive sanctions would be exacted for a wrong that can best be described as "doing whatever Justin Scott (or Omid Kamshad) happened to do."  This kind of reverse engineering of a criminal statute is unacceptable under the Due Process Clause.  It deprives the defendant of fair prospective warning, and subjects him to the arbitrary application of prohibitions that did not exist when he took the actions for which the government wants him punished.[5/]

---

[4/]     Stating that Mr. Scott made 37 round trips exaggerates the actual number of Mr. Scott's investment decisions because several of these round trips represent requests carried out on the same dates across several similar funds.

[5/]      In addition to the arguments made in the text, Mr. Scott adopts and incorporates by reference the argument made by his co-defendant at pages 6 through 8 of the memorandum in support of  Mr. Kamshad's motion for summary judgment.  Briefly put, the argument rests on the fact that Section 206 creates duties that run expressly and exclusively from an "investment adviser" to his "clients" or "prospective clients." 15 U.S.C. §80b-6(1) and (2).  See also SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 201 (1963). An investment adviser's "clients," in turn, are those "others" to whom he gives investment advice in return for compensation.  15 U.S.C. §80b-2(11).  Thus, an investment advisor can be subjected to liability under Section 206 only if he commits "fraud" upon a person or organization to whom he gives investment advice in return for compensation.

The SEC's case against Mr. Scott and Mr. Kamshad does not fit into these distinct definitional boundaries.  According to the government and its retained expert, Professor Trzcinka, "excessive short-term trading" and "market timing" can operate as "fraud" if they injure the interests of other shareholders of the mutual funds in which the defendant has traded.  See Complaint, ¶14 ("Excessive short-term trading

**3.**      **Mr. Scott Is Entitled To Summary Judgment Because The SEC Has Insufficient Evidence To Create A Genuine Issue Of Fact That He Intended To Engage In Market Timing.**

In the normal course, a defendant's summary judgment argument will sooner or later turn to a discussion of the proof available to the plaintiff: Can the plaintiff muster enough admissible evidence to create a genuine issue of material fact on the essential elements of its claims?  In this case, however, the routine factual analysis is useless with respect to the SEC's allegation that Mr. Scott engaged in "excessive short-term trading," because (1) the SEC's position appears to be that "excessive short-term trading" means whatever Professor Trzcinka says it means, and (2) Professor Trzcinka gives the phrase no objectively-measurable definition, insisting instead that "excessive short-term trading" means whatever Mr. Scott and Mr. Kamshad did when they made reallocation requests in their Putnam-controlled deferred compensation accounts.   Can the SEC prove a tautology: that Mr. Scott and Mr. Kamshad did whatever they did?  Presumably so.  However, for reasons stated, the government cannot, as a matter of law, prove (1) that such activity was "excessive" and "short-term" in any meaningful sense, (2) that such activity constituted "fraud" under Section 206, or (3) that the statute, as written and

---

in mutual funds can be detrimental to long-term shareholders in those funds"); Trzcinka Report at 2-3 (opining that defendants here engaged in market timing trades that "conflicted with the interests of other fund shareholders," and that defendants engaged in excessive short term trading that "also conflicted with the interests of other fund shareholders").  The only putative victims here, in other words, were the other shareholders of the Putnam funds for which Mr. Scott  and Mr. Kamshad made reallocation requests.

The SEC, however, has not alleged and cannot prove that these "victims" were "clients" of the defendants.  Mr. Scott did not provide investment advice to them.  Facts, ¶9-14  He worked only for Putnam, and provided investment services to it at the direction of his superiors, and was not even a day-to-day manager of any of the mutual fund portfolios in question. Id.  Putnam, itself a registered investment adviser, advised each Putnam fund pursuant to separate advisory contracts.  Thus, Mr. Scott owed no fiduciary duty to the mutual fund shareholders, and indeed, neither did Putnam.  See Goldstein v. SEC, 451 F.3d 873 (D.C. Cir. 2006) ("The adviser owes fiduciary duties only to the fund, not to the fund's investors").  Mr. Scott's only "client" was Putnam (and Putnam's "clients" were the funds).  Even if the Court assumes for purposes of argument that certain fund shareholders were victimized here (an assumption that Mr. Scott vigorously challenges and is prepared to refute), those individuals were not the defendant's "clients," and Section 206 therefore has no application to Mr. Scott or to the events at issue.

construed, gave the defendants fair warning that their actions might constitute "excessive short-term trading" or "fraud," and thus expose them to liability.

The SEC's definition of "market timing," on the other hand, retains a sliver of objectivity, against which the sufficiency of the government's evidence can actually be assessed. "Market timing" opportunities supposedly arise when the sale price (the net asset value or NAV) of a mutual fund share becomes "stale" for a period of time – that is, when an investor can predict that the fund's NAV will lag behind the estimated current market value of stocks or bonds owned by the fund. If Investor X buys a share in Fund A when its NAV is stale (and lower than the current value of Fund A's assets on the more fluid stock or bond markets), he effectively "dilutes" the value of Fund A to the extent of the difference between the stale NAV and the "real" current value. This notional dilution, according to the SEC's expert, is the primary harm caused by market timing. See Trzcinka Report at 3-4.

However, "dilution opportunities" occur frequently -- in the Putnam funds bought and sold by the defendants, on as many as 83% of the trading days that Professor Trzcinka examined. Facts ¶78. Dilution will occur whenever *any* investor buys mutual fund shares at a stale NAV, and the dilutive effect will be identical if Investor X (1) knows that the NAV is stale, and buys fund shares in order to capitalize on that condition, or (2) has no idea whether the NAV is stale, and buys fund shares because, for example, he just got his annual bonus, has heard from a friend that Fund A is a good investment, or is using a trading strategy based on benchmarks other than the staleness (or freshness) of the fund's NAV. Facts ¶79. Many, if not most, "dilutive" trades are therefore only inadvertently so, and nobody – not even the SEC – thinks that an investor engages in

21

"market timing" when he or she simply happens to make a trade that gains the advantage of a stale NAV.

Thus, when Professor Tufano set out to identify the universe of potential market timing activity by Putnam employees, he defined market timing "as transactions *primarily intended* to capitalize on short-term staleness of a fund's net asset value (NAV)." See Tufano Report at 3 (emphasis added).  And when Professor Trzcinka – the SEC's own expert -- opined on the issue, he said that "[t]he economic definition of market timing when applied to mutual funds is trading *based on a belief* that the net asset value of a mutual fund does not reflect the fair value of the fund's portfolio."  See Trzcinka Report at 3-4 (emphasis added).  An essential element of the SEC's "market timing" claim, therefore, is proof that Mr. Scott made trades (1) with knowledge ("based on a belief") that they involved mutual fund shares with stale NAVs, and (2) with the "primary intent" to capitalize on that short-term condition.

The SEC cannot, under any circumstances, prove this element of its claim.  It has no evidence at all of Mr. Scott's knowledge or intent except Professor Trzcinka's testimony, and that testimony is insufficient as a matter of law. It is axiomatic that the non-moving party can successfully resist a motion for summary judgment only by proffering *admissible* evidence that is sufficient to create a genuine issue of material fact. Fed. R. Civ. P. 56(e).   Professor Trzcinka's testimony is not admissible, for reasons stated in the "Daubert" motion in limine filed jointly today by Mr. Scott and Mr. Kamshad.   See generally Defendants' Motion To Exclude Testimony Of Charles Trzcinka.   And even if it were technically admissible, his statistical inference of

subjective intent would be inadequate to create a triable issue of fact, for reasons also stated in support of the <u>Daubert</u> motion.

There is another defect in the SEC's "market timing" case. Both Professor Tufano and Professor Trzcinka defined market timing in particular terms -- either as particular "transactions primarily intended to capitalize on short-term staleness," <u>see</u> Tufano Report at 3, or as a particular trade based on a specific "market timing opportunity." <u>See</u> Trzcinka Report at 6. It stands to reason, then, that the plaintiff in a "market timing" case can succeed only by proving that the defendant -- acting with the requisite knowledge and intent -- engaged in particular illegal transactions or trades.

The SEC hasn't met and cannot meet this burden of specificity. Its Complaint identified no "market timing" trades at all (and indeed mentioned "market timing" only in passing). In discovery, the Defendants *asked* the government to identify the particular trades that supposedly constituted "market timing," Facts ¶75, but the SEC either evaded the question entirely, <u>see</u> <u>id.</u>, or gave an evasive answer, suggesting that *all* of the defendants' reallocation requests, taken together, somehow "reveal" a "pattern" of dilutive trading. <u>See</u> <u>id.</u>

Note that while the SEC said the Defendants' reallocation requests, taken together, *reflected* market timing activity (whatever that means), it did not say that all of the Defendants' reallocation requests actually *constituted* market timing transactions. The government couldn't say that, because its own expert had opined that at least some of the Defendants' reallocation requests, made with respect to certain mutual funds, displayed "little or no evidence of market timing." <u>See</u> Trzcinka Report at 8-9.

By the same token, though, Professor Trzcinka's analysis did not give the SEC a basis on which to identify *any* of the Defendants' reallocation requests as particular market timing transactions.  His work led him only to the statistical (and syntactically-awkward) inference that there were "*Funds* with Strong Evidence of Market Timing."  See Trzcinka Report at 8-9 (emphasis added).  It apparently did not allow him to infer that any particular "trades" (that is, requests for the reallocation of assets) into those funds constituted market timing transactions.  Facts, ¶s 75-77.  But Professor Trzcinka is the SEC's only source of evidence in this regard.  If he cannot identify particular market timing transactions, then neither can the SEC.  Even if all of the definitional problems could be assumed away, therefore, Mr. Scott is nevertheless entitled to summary judgment on the "market timing" claim.

<div style="margin-left:auto">

JUSTIN M. SCOTT

By his attorneys,

_____/s/ John F. Sylvia_____
R. Robert Popeo (BBO #403360)
John F. Sylvia (BBO #555581)
Jessica Lowney Sergi (BBO #665758)
MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, P.C.
One Financial Center
Boston, MA  02111
(617) 542-6000 (*telephone*)
(617) 542-2241 (*fax*)

</div>

Dated: July 27, 2006

LIT 1580322v.2